## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: PORT NECHES FUELS, LLC, | : | Chapter 11 |
| | : | |
| Reorganized Debtors. | : | Case No. 22-10493-CTG |
| | : | |

| | | |
|---|---|---|
| TPC GROUP LITIGATION PLAINTIFFS, | : | |
| | : | Civ. No. 23-255-RGA |
| Appellants and Cross-Appellees, | : | (Consolidated appeal) |
| v. | : | |
| | : | |
| SK SECOND RESERVE L.P., *et al.,* | : | |
| | : | |
| Appellees and Cross-Appellants. | : | |

## <u>OPINION</u>

Daniel K. Hogan, Hogan McDaniel, Wilmington, DE; Sander  L. Esserman, Peter C. D'Apice, Stutzman, Bromberg, Esserman & Plifka, Dallas, TX, attorneys for appellants and cross-appellees, the TPC Group Litigation Plaintiffs.

Melissa Arbus Sherry, Charles S. Dameron, Joseph E. Begun, Latham & Watkins LLP, Washington, DC; Christopher Harris, Hugh Murtagh, Randall Weber-Levine, Latham & Watkins LLP, New York, NY; Robert J. Stearn, Jr., Paul N. Heath, Zachary I. Shapiro, Cory D. Kandestin, Alexander R. Steiger, Richards Layton & Finger, P.A., Wilmington, DE, attorneys for appellees and cross-appellants, SK Second Reserve L.P., *et al.*

March 27, 2024

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

This matter arises from the chapter 11 cases of TPC Group Inc. and certain affiliated

debtors (collectively, "TPC Group" or the "Debtors") and their confirmed plan of reorganization.

In November 2019, there were explosions at TPC Group's petrochemical plant, located in

Port Neches, Texas. TPC Group filed for bankruptcy and ultimately confirmed a plan of

reorganization. The plan released "any and all claims and Causes of Action (including any

derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the

Estates)" against certain released parties, which included the Debtors' equity sponsors.

Plaintiffs brought claims asserting personal injury and property damage from the explosion

against the TPC Group and certain third parties, including the Debtors' equity sponsors, in Texas

state court. (*See* B416). The equity sponsors moved to enforce the plan, arguing that the

plaintiffs' claims were based on piercing the corporate veil theories of liability, that any such

claims belonged to the Debtors' estates, and accordingly those claims were released under the

plan.

The Bankruptcy Court issued an order (B.D.I. 1431)[1] (the "Order") and accompanying

memorandum opinion, *In re TPC Group Inc.,* 2023 WL 2168045 (Bankr. D. Del. Feb. 22, 2023)

(the "Opinion"), which granted, in part, and denied, in part, the equity sponsors' motion. The

Bankruptcy Court ruled that, for purposes of the Texas litigation: (1) claims based on a piercing

the corporate veil theory of liability could not be asserted, as any such claims were property of the

estate and therefore released under the plan; and (2) claims for "negligent undertaking" were not

---

[1] The docket of the chapter 11 cases, captioned *In re TPC Group, Inc.*, No. 22-10493 (CTG)
(Bankr. D. Del.), is cited herein as "B.D.I. __." The appendix filed in support of Plaintiffs'
opening brief is cited herein as "A__," and the appendix filed in support of Supporting Sponsors'
answering brief is cited here in as "B__."

property of the estate and could be asserted.   The Order further directed the Plaintiffs to submit a revised complaint that complied with the plan injunction.

Plaintiffs appealed the Order, and the equity sponsors cross-appealed.

While those appeals were pending, Plaintiffs filed a proposed revised complaint, which the equity sponsors opposed.  The Bankruptcy Court issued a letter ruling holding that the proposed revised complaint adequately complied with its prior Order.

The equity sponsors appealed the letter ruling, and Plaintiffs cross-appealed.  All four appeals are before the Court.

For the reasons set forth herein, the Order is affirmed.

## I.    BACKGROUND

### A.    The Debtors

At all relevant times, TPC Group LLC owned and operated the petrochemical plant in Port Neches, Texas.  (A0508).  TPC Group LLC, its corporate parent, and another related company were Debtors in the bankruptcy.

About nine or ten entities including several Delaware partnerships had equity investment interests in the corporate parent.  These entities are the defendants in the Texas state court litigation, where they are called the "Supporting Sponsors.".

### B.    The Texas MDL

On November 27, 2019, several explosions occurred at the Port Neches plant, injuring three plant employees and causing damage to the surrounding properties.  (B423 ¶ 23).  Property owners from the surrounding areas filed individual and class action claims based on personal injury and property damage against TPC Group.  These lawsuits were consolidated in a

multidistrict litigation ("MDL") in Texas state court.[2]  The pleading at the center of this appeal is Plaintiffs' Sixth Amended Master Consolidated Petition ("Sixth Amended Petition").  (*See* B416-B529).  The bulk of the factual allegations contained in the Sixth Amended Petition concern the tortious acts and omissions of TPC Group itself.  They include that TPC failed to "develop written operating procedures to help protect" against the "clogging" of hazardous polymers; that TPC "failed to train employees" on "key equipment leading to the explosions"; that TPC failed to "correct equipment deficiencies"; and that "TPC apparently decided not to activate the alarm" after the explosions.  (B433-B439 ¶¶ 37, 38, 44).  The Sixth Amended Petition also alleges negligent acts and omissions of TPC Group's contractors but does not allege that any of TPC Group's contractors ever communicated with the Supporting Sponsors.  (B449 ¶¶ 65-81).

With respect to the Supporting Sponsors, the Sixth Amended Petition alleges that "through their financial interest, ownership, and control" of TPC Group, the Supporting Sponsors "dictate[d] the day-to-day operations and maintain[ed] complete governance over TPC and its business affairs such that there [was] unity between" TPC Group and the Supporting Sponsors. (B444-B445 ¶ 55).  Plaintiffs allege that, in order "to prevent a great injustice, the corporate separateness" between TPC Group and its remote investors "should be disregarded."  (*Id.*)  The only factual basis alleged for this asserted "unity" is the Supporting Sponsors' equity interests in TPC Group and their selection of certain members of the Board of Managers of the general partner of one of the Supporting Sponsors and the managing board for TPC Group.  (B443 ¶ 52; B444 ¶¶ 56-57; B471 ¶ 133).  Plaintiffs seek to impute the actions and omissions of TPC Group's governing board to all of the Supporting Sponsors on the basis that Supporting Sponsors' exercise

---

[2] *See In re TPC Group Litigation*, No. A2020-0236-MDL (Tex. 128th Dist. Ct. – Orange, Apr. 27, 2021).

of "owner control" was "a producing and/or proximate cause" of their claims for property damages. (B445 ¶¶ 57-62).

Plaintiffs assert eight causes of action against the Supporting Sponsors.[3] (*See* B456 ¶¶ 84-139; B479 ¶¶ 177-80). Five (Counts I, III, IV, V, and XI) do not contain any specific factual allegations regarding the conduct of the Supporting Sponsors and do not explain how any of the Supporting Sponsors harmed Plaintiffs.[4] The three causes of action against the Supporting Sponsors (Counts VI, VII, and VIII) that contain specific allegations regarding their collective conduct rest on the Supporting Sponsors' improper level of control—as corporate owners—over TPC Group's actions. Count VI asserts a cause of action for negligence, misrepresentation, and fraud, and alleges that the Supporting Sponsors "owned, operated, directed, controlled, conducted, and participated in the business and financial affairs of TPC"; that they "took control away from TPC and supplanted TPC's duties to its employees and the public"; and that, in their capacity as "the ultimate parent corporations of TPC . . . treat[ed] TPC and the TPC petrochemical plant as their personal bank accounts." (B465-B467 ¶¶ 114, 117-118). Count VII asserts a cause of action for gross negligence and essentially restates the same theory, alleging that the Supporting Sponsors took charge of "the maintenance of, and operation of the TPC plant in Port Neches," and were therefore responsible for "the negligent maintenance and/or operation of the TPC plant."

---

[3] There are additional counts that do not name any of the Supporting Sponsors as Defendants.

[4] Count I recites a litany of allegations of *per se* negligence on the part of TPC Group in connection with "TPC's . . . statutory violations" of various provisions of Texas law. (B459 ¶ 91). As to the Supporting Sponsors, Plaintiffs allege only that the Supporting Sponsors "were associated with the acts and/or omissions of TPC described herein." (B456 ¶ 84 n.57). Counts III, IV, and V assert that all of the defendants "negligently caused large explosions" without any specific reference to the acts of the Supporting Sponsors. (B461 ¶ 97; B462 ¶ 102; *see also* B463 ¶ 109). Count XI asserts that all defendants "failed to warn Plaintiffs and the general public of a developing danger known to Defendants," but does not identify any conduct on the part of the Supporting Sponsors. (B480 ¶ 179).

(B469 ¶¶ 125-26).  Count VIII asserts a cause of action for direct liability and alleges that the Supporting Sponsors "maintain such a high degree of financial interest, ownership, and control over TPC that [they] are directly acting through TPC."  (B471 ¶ 133).  Count VIII further alleges that where "improper use" of the corporate form has "damaged the community estate," the corporation's "shareholders are directly liable and cannot hide behind the corporation."  (B471 ¶ 132).  "But for" the Supporting Sponsors' oversight of TPC Group, Plaintiffs assert, "the explosions . . . would not have occurred" (B472 ¶ 136), and the "distinct corporate identity" of TPC Group should be disregarded as a "corporate fiction."  (B417 ¶ 135; B472 ¶ 139).

## C.  The Plan Release and Injunction

On June 1, 2022, TPC Group filed for chapter 11 bankruptcy.  Various parties had entered into a Restructuring Support Agreement ("RSA"), which contemplated that the Supporting Sponsors would (1) receive no recovery under the contemplated plan of reorganization, and (2) refrain from making certain tax elections, thereby preserving for the bankruptcy estate $630 million in tax benefits.  (B410-B411 ¶¶ 27-28).  TPC Group agreed to release any claims and causes of action it might have against the Supporting Sponsors.  (B406 ¶¶ 16-17).  TPC Group filed its proposed plan on November 7, 2022 (the "Plan").  Article 10.7(a) of the Plan provides that the Debtors, their estates, and the reorganized Debtors release "any and all claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates)" against the Supporting Sponsors.  (A0334-A0335).  Article 10.9(a) of the Plan "permanently enjoin[s] the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan."  (A0337).  On December 1, 2022, the Bankruptcy Court confirmed the Plan (A0350-A500) ("Confirmation Order").

**D.     The Order and Accompanying Opinion**

The Supporting Sponsors thereafter moved to enforce the Plan's release and injunction provisions against Plaintiffs.  (A0501-A0688).

The Bankruptcy Court issued the Order granting the Supporting Sponsors' motion to enforce the Plan in part and denying it in part.  The Bankruptcy Court recognized that the "basic analytic framework" for determining whether a cause of action belongs to a bankruptcy estate is "set forth" in the Third Circuit's decision in *In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014).  *In re TPC Group*, 2023 WL 2168045, at \*4.  Under *Emoral* and related precedents, the Bankruptcy Court held that "in circumstances like those presented in this case, . . . any claim for veil piercing would be an estate cause of action."  *Id.*

The Bankruptcy Court noted that Plaintiffs' "only real response . . . [was] to say that they are not really bringing a claim for veil piercing."  *Id.* at \*7.  Recognizing that Plaintiffs had asserted at least one claim premised on veil-piercing in their Sixth Amended Petition, the Bankruptcy Court noted that "Count VIII, despite being labeled 'Direct Liability of the Owners and [one of the Supporting Sponsors],' is in substance a claim for veil piercing."  *Id.* at \*3.  Even though that count "alleged 'independent torts' . . . [it] nowhere sets forth what those alleged torts are."  *Id.*  "As far as this court can discern, this count asserts no claim for a specific independent tort.  To the extent it might add anything to the other claims in the complaint, the only thing that it can be adding is a claim that the Supporting Sponsors should be held vicariously liable for the debtors' alleged tortious conduct."  *Id.*  Such a vicarious liability claim premised on an alter-ego or veil-piercing theory would "stray[] across the line" set forth in the Plan, and, under *Emoral*, "assert[] an estate cause of action."  *Id.* at \*7.

The Bankruptcy Court also concluded that Plaintiffs had elsewhere "expressly assert[ed] that certain Supporting Sponsors are liable on a theory of negligent undertaking."  *Id.* at \*3.  In the

Bankruptcy Court's view, a claim for negligent undertaking, if "adequately pled . . . would not violate the plan injunction." *Id.* at *8. The Bankruptcy Court reasoned that "the basic premise of the law of negligent undertaking is that someone who undertakes to protect the safety of a third person must do so reasonably." *Id.* Thus, "[w]hile an action by the party to whom the undertaking is made would be property of that party, an action by the third party is equally the third party's lawsuit." *Id.* It followed, the Bankruptcy Court concluded, that a negligent undertaking claim asserted by Plaintiffs "would not be the debtor's cause of action." *Id.*

Finally, because Plaintiffs' various "counts do not specify which conduct gives rise to the claims," *id.* at *3, as the Sixth Amended Petition included "a hodgepodge of allegations—some involving direct conduct by the Supporting Sponsors and others that appear to rely on theories of vicarious liability," the Bankruptcy Court directed Plaintiffs to "submit to this Court a complaint that relies *only* on . . . direct allegations of tortious conduct" on the part of the Supporting Sponsors. *Id.* at *10-11. The Bankruptcy Court explained that once "the complaint is revised so that it complies with the plan injunction, the MDL court may then determine whether the allegations are sufficient to state a claim under state law." *Id.* at *11.

On March 8, 2023, Plaintiffs filed their notice of appeal. (Civ. No. 23-255, D.I. 1). The Supporting Sponsors cross-appealed on March 22, 2023. (Civ. No. 23-316, D.I. 1).

**E.    The Letter Ruling**

On March 23, 2023, while the two appeals were pending, Plaintiffs filed with the Bankruptcy Court a proposed Seventh Amended Petition, asserting in an accompanying letter that the new petition removed all of the alter-ego and veil-piercing allegations contained in the Sixth Amended Petition. (A0741). The Supporting Sponsors asserted in response that the pending appeals had divested the Bankruptcy Court of jurisdiction to expand on its prior Order and, as such, it could not rule on the adequacy of the Seventh Amended Petition. (B545). The Supporting

Sponsors further asserted that Plaintiffs had failed to remove all of their alter-ego and veil-piercing allegations from the Seventh Amended Petition.

On April 18, 2023, the Bankruptcy Court issued a letter ruling holding that Plaintiffs' Seventh Amended Petition adequately complied with the prior Order. (A0902). The Bankruptcy Court held that it was not divested of jurisdiction because it was not altering or modifying its prior Order. It further found that Plaintiffs had removed all alter-ego allegations from the Seventh Amended Petition, because even though some of the allegations continued to discuss alter-ego liability, those allegations related to Plaintiffs' negligent undertaking claims.

On April 21, 2023, the Supporting Sponsors appealed the letter ruling. (Civ. No. 23-447, D.I. 1). Plaintiffs thereafter cross-appealed. (Civ. No. 23-481, D.I. 1).

F.    **The Appeals**

The parties moved for consolidation of the four appeals for procedural purposes. (D.I. 14). On May 26, 2023, I granted the consolidation motion. (D.I. 15). The consolidated appeal is fully briefed. (Civ. No. 23-255, D.I. 22, 24, 26). I did not hold oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

II.   **JURISDICTION**

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District courts have jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1).

I previously directed the parties to address the Court's jurisdiction to consider the consolidated appeal. (D.I. 16). On June 2, 2023, the parties jointly responded, explaining that the last two appeals were certainly taken from a final, appealable order—the letter ruling—which ended the Bankruptcy Court's proceedings on the Supporting Sponsors' motion to enforce the

Plan. (D.I. 18 at 2-3). Therefore, whether or not the first two appeals were taken from a final order did not matter. (*Id.* at 2-4). I agree that the Bankruptcy Court's letter ruling was a final, appealable order under 28 U.S.C. § 158(a)(1).

## III.   STANDARD OF REVIEW

In conducting its review of the issues on appeal, this Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review over questions of law. *See American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). The appeals raise three issues of law: (1) whether the Bankruptcy Court erred in holding that Plaintiffs' claims premised on veil-piercing were released by the Plan; (2) whether the Bankruptcy Court erred in holding that Plaintiffs' negligent undertaking claims were not released by the Plan; and (3) whether the Bankruptcy Court erred in issuing a letter ruling expanding upon its original Order despite pending appeals challenging the same. Each of these issues is reviewed *de novo*. *See Westmoreland Hum. Opportunities, Inc. v. Walsh*, 246 F.3d 233, 242 (3d Cir. 2001) (whether item constitutes "property of the estate for purposes of § 541 raises a question of law" subject to plenary review); *Peter Bay Homeowners Ass'n, Inc. v. Stillman*, 294 F.3d 524, 532 (3d Cir. 2002) (jurisdictional rulings are reviewed *de novo*).

## IV.   ANALYSIS

### A.   Claims Premised on Veil-Piercing Were Released Under the Plan

The Bankruptcy Court concluded that, pursuant to the Third Circuit's *Emoral* decision, Plaintiffs' claims premised on veil-piercing belong to the bankruptcy estate and were therefore released by the Plan as (1) they arose before the commencement of the bankruptcy, and TPC Group itself could have pursued them, and (2) the claims are "general"—meaning they implicate the interests of all of TPC Group's creditors.

10

1. **The Third Circuit's *Emoral* Decision Is Binding Precedent**

Under the Bankruptcy Code, property of a bankruptcy estate encompasses "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). As the Third Circuit has explained, once a company files for bankruptcy, its "creditors lack standing to assert claims that are 'property of the estate.'" *In re Emoral*, 740 F.3d at 879 (quoting *Bd. of Trs. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002)). This rule "promotes the orderly distribution of assets in bankruptcy" and "comports with 'the fundamental bankruptcy policy of equitable distribution to all creditors that should not be undermined by an individual creditor's claim.'" *Id.* (quoting *Koch Refin. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1344 (7th Cir. 1987)). The Third Circuit's test for determining whether a claim is property of the estate is set forth in *Emoral*.

The case involved a prepetition sale of assets by Emoral, a manufacturer of diacetyl, to Aaroma. *See In re Emoral*, 740 F.3d at 877. At the time of the sale, both parties were aware of potential claims against Emoral by individuals exposed to diacetyl, and the sale agreement provided that Aaroma would not assume Emoral's diacetyl exposure liabilities. *See id.* Emoral filed a bankruptcy case the following year, and the trustee brought an adversary proceeding against Aaroma, alleging that the prepetition sale constituted a fraudulent transfer. *See id.* The parties reached a settlement pursuant to which Aaroma would pay $500,000 and the trustee agreed to release Aaroma from any "causes of action ... that are property of the Debtor's Estate." *Id.* The diacetyl plaintiffs thereafter sued Aaroma, asserting that Aaroma, as a "mere continuation" of Emoral, was liable for their injuries. Aaroma moved to enforce the settlement agreement, arguing that any such claims belonged to Emoral's estate and had been released pursuant to the settlement. The district court held that a cause of action for successor liability was a "generalized" claim belonging to the estate because the facts giving rise to the cause of action were not specific to the

11

diacetyl plaintiffs but common to all creditors  On appeal, the Third Circuit set forth a two-part analysis for determining whether a claim belongs to the estate or whether it belongs to an individual creditor.  First, for a cause of action to be "property of the estate" it must have "existed at the commencement of the [bankruptcy] filing" and must be a claim that "the debtor could have asserted on his own behalf under state law." *Id.* at 879 (quoting *Foodtown*, 296 F.3d at 169 n.5). Second, the "claim must be a 'general one, with no particularized injury arising from it.'" *Id.* (quoting *Foodtown*, 296 F.3d at 170); *see also Artesanias Hacienda Real S.A. de C.V. v. N. Mill Cap., LLC (In re Wilton Armetale, Inc.)*, 968 F.3d 273, 282 (3d Cir. 2020).  "On the other hand, if the claim is specific to the creditor, it is a "personal" one and is a legal or equitable interest only of the creditor.  A claim for an injury is personal to the creditor if other creditors generally have no interest in that claim." *Id.* (quoting *Foodtown*, 296 F.3d at 170).

At first glance, it might appear that a claim for personal injury based on diacetyl exposure could be nothing other than a "personal" claim, from which a "particularized injury aris[es]," that is "specific to the creditor."  Not so, held the Third Circuit in *Emoral*.  To determine whether the diacetyl plaintiffs' cause of action against Aaroma constituted property of Emoral's bankruptcy estate, the Third Circuit explained that it "must examine the nature of the cause of action itself." *Id.*  This inquiry looks to the "theory of liability" asserted by the creditor, rather than the particular injury suffered by the creditor.  *Id.* The goal of this inquiry is to isolate theories of liability that "inure[ ] to the benefit of all creditors" from those that are "personal to the creditor" and in which "other creditors generally have no interest." *Id.* (quoting *Foodtown*, 296 F.3d at 170). This ensures that those claims that benefit all creditors are "properly pursued by the bankruptcy trustee" rather than individual creditors, so as to "promote[] the orderly distribution of assets in bankruptcy." *Id.*

Examining the "theory of liability" asserted in *Emoral*—liability based on a "mere continuation" theory—the diacetyl's plaintiffs were required to "establish that there is continuity

in management, shareholders, personnel, physical location, assets and general business operation

between selling and purchasing corporations following the asset acquisition." *Id.* at 880.  The

Third Circuit held:

> The Diacetyl Plaintiffs fail to demonstrate how any of the factual
> allegations that would establish their cause of action based on
> successor liability are unique to them as compared to other creditors
> of Emoral.  Likewise, they fail to demonstrate how recovery on their
> successor liability cause of action would not benefit all creditors of
> Emoral given that Aaroma, as a mere continuation of Emoral, would
> succeed to all of Emoral's liabilities. Thus, the Diacetyl Plaintiffs'
> cause of action against Aaroma is "general" rather than
> "individualized."

*Id.*  The Third Circuit further likened the diacetyl plaintiffs' claims based on a mere continuation

theory of liability to claims premised, as here, on alter-ego and veil-piercing theories of liability.

*See Emoral,* 740 F.3d at 879 (explaining that a claim that rests on an assertion that the defendant is

an "alter ego" of the debtor is clearly "common" to all creditors and thus general (quoting *St. Paul*

*Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989))).

## 2.     The Bankruptcy Court's Determination that Plaintiffs' Veil-Piercing Claims Were Released Under the Plan Is Consistent with *Emoral*

The Bankruptcy Court applied *Emoral* in reaching its conclusion.  With respect to the first

part of the inquiry, the Bankruptcy Court held that Plaintiffs' veil-piercing claims—which arose

from alleged prepetition conduct and thus existed at the commencement of the bankruptcy filing—

are claims that "the debtor could have brought" on its own behalf.  *In re TPC Group*, 2023 WL

2168045, at *6.  Under both Delaware and Texas law, "a wholly-owned corporate subsidiary can,

in fact, pierce its own corporate veil and hold liable a third-party non-debtor." *Id.* (quoting *In re*

*Maxus Energy Corp.*, 571 B.R. 650, 658 (Bankr. D. Del. 2017); *S.I. Acquisition, Inc. v. Eastway*

*Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1152-53 (5th Cir. 1987).

With respect to the second part of the inquiry, the Bankruptcy Court recognized that "the question of whether the claim is specific or general cannot turn on whether each plaintiff suffered its own particularized injury." *In re TPC Group*, 2023 WL 2168045, at *6. Consistent with *Emoral*, the Bankruptcy Court focused on the Plaintiffs' theory of liability: "the question is whether the basis for holding the third party liable is unique to a particular creditor or applies equally to all creditors." *Id.* "[T]he proper focus is not on individual injury but on whether the conduct that gives rise to the alleged liability was directed at a particular creditor." *Id.* A specific claim will typically be one that depends on "the personal dealings between [the debtor] and such creditors." *Id.* (quoting *In re Koch Refining*, 831 F.2d at 1349). No such allegations are made here. Rather, the factual allegations necessary to establish Plaintiff's theory of liability against the Supporting Sponsors would be the same for other creditors and the debtor alike, so the claims premised on piercing the veil are general. *Id.* (citing *In re Emoral*, 740 F.3d at 879); *see also Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 618 (D. Del. 2018).

The Court agrees that Plaintiffs' claims seeking to hold the Supporting Sponsors liable under an alter-ego or veil-piercing theory are general claims belonging to the estate. The claims rest on the Supporting Sponsors' lack of separateness from the TPC Group, and their level of control over TPC Group, which Plaintiffs assert "far surpass[ed] the level of control typically exercised as a normal incident of corporate ownership." (B468 ¶ 119). These factual allegations, which go only to whether TPC Group was the Supporting Sponsors' "mere tool" and to the "unity between" the Supporting Sponsors and TPC Group (A0649; A0730), "would also be available to any other creditor" to hold the Supporting Sponsors liable on a veil-piercing theory. *In re TPC Group*, 2023 WL 2168045, at *7; *Koch Refin.*, 831 F.2d at 1348-49 (claims premised on the relationship between the debtor and its parent are general).

14

### 3.   Plaintiffs' Particularized Injury Arguments Fail Under *Emoral*

Plaintiffs focus on the injuries they suffered in the wake of the Port Neches explosions,

arguing that their claims "that use the words 'alter ego' or 'pierce the veil' are based on direct and

personalized injuries to the MDL Plaintiffs." (D.I. 22 at 5).  Plaintiffs elsewhere contend they

"have alleged particularized, fact-specific personal injuries and individual damages arising from"

the Supporting Sponsors' conduct, and that "recovery on such claims would not benefit all

creditors generally but only the individual MDL Plaintiffs."  (*Id.* at 18; *see also, id.* at 21 ("There

are few injuries more direct and particularized than personal injury and property damage."); *id.* at

24 ("[T]he injuries alleged by [Plaintiffs] here are all personal to each of them."); *id.* at 30

("Supporting Sponsors . . . cause[d] . . . the direct injuries suffered by the MDL Plaintiffs.").  This

is precisely the argument made in Judge Cowen's dissent in *Emoral*:

> Because the Diacetyl Plaintiffs' [claims] against Aaroma "could
> [not] be brought by any creditor of the debtor," they constitute
> individualized claims belonging to the Diacetyl Plaintiffs
> themselves—and not to the debtor or the bankruptcy estate. Initially,
> it is uncontested that the underlying personal injury claims against
> Emoral are individualized in nature. In fact, personal injury and
> product liability causes of action under state law represent
> quintessential examples of an individualized claim, i.e., "a
> 'personal' [claim that is] a legal or equitable interest only of the
> creditor."

*In re Emoral,* 740 F.3d at 883 (J. Cowen, dissenting) (quoting *Foodtown,* 296 F.3d at 170).  In

Judge Cowen's view, the critical question was whether the plaintiffs were suing for themselves or

for the benefit of all, the former being individual property and the latter being estate property.  *In

re Emoral*, 740 F.3d at 885-86 & n.1. The Third Circuit rejected this approach, however, as have

other circuits.  *Id.* at 879; *see In re Tronox Inc.*, 855 F.3d 84, 102-03 (2d Cir. 2017) (agreeing with

the majority in *Emoral*).  Indeed, the Third Circuit faulted the diacetyl plaintiffs' "focus on the

individualized nature of their personal injury claims" where their only theory of liability against

Aaroma was its alleged "mere continuation" of the Debtor under state law.  *See In re Emoral*, 740 F.3d at 879.  Similarly, this Court has rejected a creditor's request to look at the particular injury the creditor suffered in deciding whether the claim was property of the estate, acknowledging that *Emoral* made clear that was "the wrong way to look at the issue."  *Soroof*, 320 F. Supp. 3d at 625.  Instead, the Court analyzed the creditor's "theory of liability" and whether that theory could be asserted by any creditor for the general benefit of all creditors.  *Id.* (quoting *Emoral*, 740 F.3d at 879).  That is precisely the analysis the Bankruptcy Court correctly applied here.  To the extent that Plaintiffs assert that their claims are not estate claims because of their particularized injuries, case law is to the contrary.

Plaintiffs also cite *In re Caribbean Petroleum Corp.*, 512 B.R. 774 (Bankr. D. Del. 2014) to suggest their claims do not belong to the estate.  (*See* D.I. 22 at 20-22).  *Caribbean Petroleum* concluded that the plaintiffs' alter-ego claims did not belong to the estate because they rested on individualized injury, but this is an approach that *Emoral* clearly rejects.  The bankruptcy court in *Caribbean Petroleum* attempted to distinguish *Emoral* on the ground that the plaintiffs' "claims for injuries," unlike the successor-liability claims in *Emoral*, were "personal, not generalized," but did not consider whether the plaintiffs' alter-ego *theory of liability* was general or particular to the plaintiffs.  *Caribbean Petroleum*, 512 B.R. at 780.  As the Bankruptcy Court noted, *Caribbean Petroleum* is at odds with *Emoral*.  *In re TPC Group*, 2023 WL 2168045, at *6.  Focusing merely on whether "each claimant suffered its own unique injury," as the bankruptcy court in *Caribbean Petroleum* did, "cannot itself be sufficient" because the relevant question is instead "whether the basis for holding the third party liable is unique to a particular creditor or applies equally to all creditors."  *Id.*

Plaintiffs' reliance on *Foodtown* is misplaced, as that case does not address whether a claim resting on a veil-piercing theory is "general" or not.  Rather, *Foodtown* involved claims that

16

arose *after* commencement of the bankruptcy proceedings, and the specific claims at issue in that case—an ERISA claim for evasion of withdrawal liability—could have been brought only by the plaintiffs in that case, and therefore did not belong to the estate. *See Foodtown*, 296 F.3d at 170. Here, on the other hand, Plaintiffs' veil-piercing theory rests on events that occurred prepetition, and TPC Group itself could assert claims against the Supporting Sponsors on the same theory.

### 4.    Plaintiffs Assert Alter-Ego and Veil Piercing Claims

Finally, the Bankruptcy Court properly rejected Plaintiffs argument that they are "are not really bringing a claim for veil piercing." *In re TPC Group*, 2023 WL 2168045 at *7. Plaintiffs assert, "Piercing the corporate veil is not itself an independent cause of action, but rather is a means of imposing liability on an underlying cause of action." (D.I. 22 at 29). The Court agrees with the Supporting Sponsors that this argument is a red herring. As *Emoral* explains, whether a claim asserted by a creditor properly belongs to the bankruptcy estate is driven by the "theory of liability," not the cause of action. *In re Emoral*, 740 F.3d at 879. Veil-piercing forms a distinct theory of liability under Texas law. *See, e.g., PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 174 (Tex. 2007) (discussing the "elements of proof" involved in "substantive veil-piercing," *i.e.*, "veil-piercing for purposes of liability"); *In re GTG Sols., Inc.*, 642 S.W.3d 41, 45 (Tex. App. 2021) (noting "sometimes referred to as "pierc[ing] the corporate veil," an alter ego claim seeks to disregard a corporate entity and hold the entity's individual owners or officers liable for a claim against the entity" and discussing requirements).

Plaintiffs assert, "MDL Plaintiffs are not seeking to impose liability on the Supporting Sponsors merely on a theory that their liability derives from being an alter ego of the Debtors." (D.I. 22 at 29-30). According to Plaintiffs, their claims "are not claims for vicarious liability, do not allege that the Debtors harmed the plaintiffs, and do not assert that the Supporting Sponsors are the alter egos of the Debtors and liable as such to the MDL Plaintiffs." (*Id.* at 3-4). Even

though some of their "[c]laims . . . use the words 'alter ego' or 'pierce the veil[,]'" Plaintiffs assert

that those claims ultimately "assert ***direct*** liability of the Supporting Sponsors, not vicarious

liability for the Debtors' wrongs." (*Id.* at 18).  These arguments must be rejected.  The Sixth

Amended Petition repeatedly asserts that the Texas MDL Court should disregard TPC Group's

corporate form and impute actions of TPC Group to the Supporting Sponsors.  Plaintiffs allege

that the Supporting Sponsors should not be permitted to "hide . . . behind the corporate form of

TPC" (B472 ¶ 136); that the MDL Court should not "recogniz[e] the distinct corporate identity" of

TPC Group if doing so would "frustrate the ability of injured parties to seek damages against" the

Supporting Sponsors (B471 ¶ 135); and that "corporate separateness should be disregarded" (B445

¶ 55).  Plaintiffs also allege classic elements of veil-piercing theory of liability, including that the

Supporting Sponsors "maintain such a high degree of financial interest, ownership, and control

over TPC that shareholders are directly acting through TPC" (B471 ¶ 133), and that the

Supporting Sponsors maintained an "incestuous relationship" with TPC Group characterized by a

"shared undercapitalized, underinsured business model" (B445 ¶ 55).  The Sixth Amended

Petition clearly asserts alter-ego, veil-piercing theories of liability.

Applying *Emoral*, the Bankruptcy Court correctly concluded that Plaintiffs' claims

premised on veil-piercing theories are "estate cause[s] of action that ha[ve] been resolved under

the debtors' confirmed plan and whose assertion is barred by the plan injunction." *In re TPC*

*Group*, 2023 WL 2168045, at *7.  I will affirm this portion of the Order.

**B.      Plaintiffs' Negligent Undertaking Claims Were Not Released Under the Plan**

The Bankruptcy Court concluded, "Unlike a claim for veil piercing, under *Emoral*, any

claim that the tort plaintiffs may assert for negligent undertaking would be a direct claim that

belongs to the tort plaintiffs, not the debtors, and therefore is outside the scope of the plan

injunction." *Id.* at *8.  It explained that "the basic premise of the law of negligent undertaking is

that someone who undertakes to another to protect the safety of a third person must do so reasonably. Liability is imposed on one who undertakes to provide such services and fails to take reasonable care if that failure results in harm to the third persons whose safety was at issue." *Id.* (citing Restatement (Second) of Torts § 324A) (Westlaw 2023). Thus, "duty is owed, under the law of negligent undertaking, not only to the party to whom the undertaking is made but also to third persons whose safety is at issue." *Id.* So "while an action by the party to whom the undertaking is made would be property of that party, an action by the third party is equally the third party's lawsuit. Such a claim would not be the debtor's cause of action under the first prong of *Emoral.*" *Id.*

The Supporting Sponsors have cross-appealed with respect to this portion of the Order. They argue that, applying *Emoral*, TPC Group itself could have asserted a negligent undertaking claim against the Supporting Sponsors based on the facts alleged by Plaintiffs, that such a claim would benefit all of TPC Group's creditors, and the negligent undertaking claims therefore belong to the estate. (*See* D.I. 24 at 22, 27-29). According to Plaintiffs, however, this argument "misses the point that there are two separate claims involved." (D.I. 26 at 6-7). Because the "Plaintiffs have separate, direct claims against the Supporting Sponsors based on separate duties and damages," "the analysis in *Emoral* is not applicable." (*Id.* at 8). Plaintiffs cite no cases in support of this proposition, but further argue, "Even under *Emoral*, the negligent undertaking claims fail to meet the first *Emoral* prong because such a claim would not be, as the Bankruptcy Court correctly found, the Debtors' cause of action. No further analysis under *Emoral* is needed." (*Id.*)

*Emoral* states the controlling law for determining whether Plaintiffs' negligent undertaking claims belong to the estate.

First, the Court must consider whether Plaintiffs' claims "existed at the commencement of the [bankruptcy] filing and [whether] the debtor could have asserted the claim[s] on his own

19

behalf under state law." *Emoral*, 740 F.3d at 879 (quoting *Foodtown*, 296 F.3d at 169 n.5).  Here, Plaintiffs' negligent undertaking claims existed at the time of the bankruptcy, but are they claims that TPC Group could have brought on its own behalf?

The thrust of Plaintiffs' negligent undertaking claims, as set forth in their briefing before the Texas Supreme Court, is that the Supporting Sponsors "den[ied] resources and maintenance the Port Neches plant staff repeatedly requested" (A0666) and made "operational decisions [that] . . . directly led to [the plant's] spectacular destruction" (A0655).  Those alleged acts of negligence harmed not only Plaintiffs.  They also harmed TPC Group by preventing TPC Group from achieving "operational excellence" at the Port Neches plant and ultimately caused the plant's destruction.  Assuming the truth of Plaintiffs' allegations, TPC Group itself could have pursued a negligent undertaking claim against the Supporting Sponsors.

"Under Texas law, a defendant who undertakes 'to render services that it knows or should know are "necessary for the protection of the other's person or things"' must generally 'exercise reasonable care in performing the undertaking.'" *In re First Reserve Management, L.P.*, 671 S.W.3d 653, 660 (Tex. 2023).[5]  "[L]iability for negligent undertaking [cannot] be predicated on a promise to render a service that is not accompanied by either performance or *reliance* on the promise *by the injured party*." *Id.* (emphasis in original).  A party liable for the tort of negligent undertaking is liable to the party he undertakes to serve where his services result in physical harm and may also be liable to "innocent by-standing third parties," such as Plaintiffs. *Seay v. Travelers Indem. Co.*, 730 S.W.2d 774, 776 (Tex. App. 1987).  Thus, both the party with whom the

---

[5] The Texas Supreme Court decided this case, involving an earlier version of Plaintiffs' same negligent undertaking claim, after the Bankruptcy Court issued its decision.  The Bankruptcy Court was careful to delineate that its role was not to decide whether the negligent undertaking claim in the version before it actually stated a claim under Texas law. The Bankruptcy Court held, and I agree with it, that the validity of the complaint under Texas law was an issue for Texas courts, and not for the Bankruptcy Court.

tortfeasor is "in privity" (here, TPC Group) and the innocent bystanders (here, Plaintiffs) can pursue a claim against the Supporting Sponsors on a negligent undertaking theory.  *See id.; see, e.g.*, *Magna Cum Latte, Inc. v. Diedrich Coffee, Inc. (In re Magna Cum Latte, Inc.)*, 2007 WL 3231633, at *14 (Bankr. S.D. Tex. Oct. 30, 2007) (debtor's assertion of negligent undertaking claim in bankruptcy).  These are two different theories.  One is based on a duty owed to TPC Group, and the other is based on a duty owed to innocent bystanders.  Thus, the first part of the *Emoral* inquiry is not satisfied.  In the alternative, though, the same logic results in a conclusion that Plaintiffs' claims are "specific to the creditor," as set forth below.

Second, the court must consider whether the claim is "specific to the creditor"; that is, whether "other creditors generally have no interest in [the] claim." *Emoral*, 740 F.3d at 879.  In undertaking this analysis, the court must be mindful—first and foremost—of the "theory of liability" asserted by the creditor.  *Id.*

In considering the theory of liability, I think it is helpful to consider what *Emoral* and the cases it relies upon were considering and deciding.

> This appeal requires us to determine whether personal injury causes of action arising from the alleged wrongful conduct of a debtor corporation, asserted against a third-party non-debtor corporation on a "mere continuation" theory of successor liability under state law, are properly characterized as "generalized claims" constituting property of the bankruptcy estate.

*Id.* at 876.

> To determine whether [Plaintiffs'] cause of action against [Third Party] constitutes property of Emoral's bankruptcy estate, we must examine the nature of the cause of action itself. While [Plaintiffs] focus on the individualized nature of their personal injury claims against Emoral, we cannot ignore the fact, and fact it be, that their only theory of liability as against [Third Party], a third party that is not alleged to have caused any direct injury to [Plaintiffs], is that, as a matter of state law, [Third Party] constitutes a "mere continuation" of Emoral such that it has also succeeded to all of Emoral's liabilities.

*Id* at 879.

The cases upon which *Emoral* relies similarly were considering veil-piercing, alter ego, and successor liability theories, because in each case, the third party had caused no direct harm to the plaintiffs. *See St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701, 703-04 (2d Cir. 1989) ("alter ego or others who have misused the debtor's property in some fashion"); *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348-49 (7th Cir. 1987) ("alter ego or others who have misused debtor's property in some fashion"); *In re OODC, LLC*, 321 B.R. 128, 136 (Bankr. D. Del. 2005) (successor liability); *In re Buildings by Jamie, Inc.*, 230 B.R. 36, 43 (Bankr. D. N.J. 1998) (alter ego veil piercing); *In re Keene Corp.*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994) (successor liability).

Here, any claim by the Plaintiffs against the Supporting Sponsors for negligent undertaking would not have been a general claim because it would not have "inure[d] to the benefit of all creditors." *Emoral*, 740 F.3d at 879.

The Second Circuit considered *Emoral* in *In re Tronox*:

> That the plaintiffs in *Emoral* had an underlying harm specific to them did not put the claims automatically outside the estate. Indeed, every creditor in bankruptcy has an individual claim (set forth in a proof of claim) against the debtor, whether it be in tort (as here), contract, or otherwise. But often there are claims against third parties that wrongfully deplete the debtor's assets. Individual creditors may wish to bring claims against those third parties to seek compensation for harms done to them by the debtor and secondary harms done to them by the third parties in wrongfully diverting assets of the debtor that would be used to pay the claims of the individual creditor. The fact that an individual creditor may seek to do so does not make those secondary claims particular to the creditor, for it overlooks the obvious: Every creditor has a similar claim for the diversion of assets of the debtor's estate. Those claims are general—they are not tied to the harm done to the creditor by the debtor, but rather are based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim against the debtor.
>
> The plaintiffs in *Emoral* would have courts allow an individual creditor to sue third-party successors of debtors for claims that are truly aimed at recovering estate assets. The exact same claim advanced by the trustee on behalf of the estate would be a win for all

> creditors of the estate, but a win by a single creditor would be a win by one to the
> detriment of the others. That "is precisely the sort of result the Bankruptcy Code exists to
> forestall, by placing exclusive standing over estate claims in the bankruptcy trustee or plan
> administrator."

*In re Tronox Inc.*, 855 F.3d at 103–04 (footnote omitted).

I think the Bankruptcy Court recognized that, analogous to the Second Circuit's analysis in

*Tronox*, Plaintiffs have tried to advance two sets of claims.  Plaintiff's veil-piercing theories are

similar to wrongful depletion of assets; they are general claims that relate to all creditors and are

therefore property of the bankruptcy estate.  Plaintiff's negligent undertaking theories are for

harms done to them directly by the Supporting Sponsors.  Those claims are not general claims

because the only creditors who have an interest in them are Plaintiffs.  For these reasons,

Plaintiffs' claims that the Supporting Sponsors misused the Port Neches plant by "demand[ing]

TPC increase production all the while crucially denying funds to adequately supply the plant with

spare parts . . . or perform necessary maintenance needed to keep the plant safe" (A0666) are not

"common claims against . . . [non-debtors] who have misused the debtor's property in some

fashion." *Emoral*, 740 F.3d at 879 (quoting *St. Paul Fire & Marine Ins. Co.*, 884 F.2d at 701).

Allowing Plaintiffs to assert those claims as "direct" creditor claims would permit Plaintiffs to

recover on their theory of liability.

The Bankruptcy Court agreed with Plaintiffs that they have their own "separate" and

"direct" cause of action for negligent undertaking against the Supporting Sponsors, and that such a

claim cannot belong to the estate. *In re TPC Group*, 2023 WL 2168045, at *8-9 ("The point of the

tort of negligent undertaking, however, is to give the homeowners a direct claim against contractor

for the damages they suffered").  For the reasons stated above, I conclude that the negligent

undertaking claims do not belong to the bankruptcy estate and are not among those claims released

under the Plan.  I will affirm this portion of the Order.

**C.       The Bankruptcy Court Did Not Violate the Divestiture Rule**

Having decided to affirm Order, I am left with the Supporting Sponsors' challenge to the April 18 letter ruling.  The Order directed Plaintiffs to submit an amended petition relying only "on . . . direct allegations of tortious conduct" on the part of the Supporting Sponsors.  *In re TPC Grp.*, 2023 WL 2168045, at *11.  When Plaintiffs appealed the Order, the Supporting Sponsors argue, the Bankruptcy Court was divested of jurisdiction to entertain any amended petition or to enter the letter ruling, which approved the Seventh Amended Petition as having fixed the defects of the Sixth Amended Petition.  The Supporting Sponsors further argue that the letter ruling did not merely enforce the Order but rather "expanded upon (and in some respects modified)" the Order.  (D.I. 24 at 44).

"[A] notice of appeal is an event of jurisdictional significance in which a lower court loses jurisdiction over the subject matter involved in the appeal."  *Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.)*, 369 B.R. 752, 757 (B.A.P. 1st Cir. 2007).  Although a bankruptcy court may proceed on matters unrelated to an appeal, it cannot address "those matters that can directly affect the outcome of the appeal" or are "so closely related" to the matters on appeal that addressing them would "impermissibly interfere[]" with the appeal, or otherwise "impact the appeal so as to interfere with or effectively circumvent the appeal process."  *Id.* at 759, 761. While a bankruptcy court may enforce its own orders, enforcement is distinct from "acts which expand upon or alter [an order], which are prohibited."  *In re Wash. Mut., Inc.*, 461 B.R. 200, 219 (Bankr. D. Del. 2011) (citation omitted), *vacated in part*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).

The parties dedicate very little of the briefing to the divestiture argument.  (*See* D.I. 24 at 44-49; D.I. 26 at 8-9).  The Supporting Sponsors first advance a general argument that the Bankruptcy Court lacked jurisdiction to consider the Seventh Amended Petition because, in doing

so, the Bankruptcy Court addressed matters that "directly affect the outcome of the appeal," were "so closely related" to the matters on appeal that the letter ruling "impermissibly interfere[d]" with the appeal, or otherwise "impact[s] the appeal so as to interfere with or effectively circumvent the appeal process." (D.I. 24 at 46).[6]  The Supporting Sponsors merely cite case law propositions, however, without applying them to the facts to demonstrate how the letter ruling affected the outcome of the appeal, interfered with the appeal, or allowed any party to circumvent the appeal process. (*See id.*)  The Bankruptcy Court rejected the Supporting Sponsors' challenge that "[a]ny substantive analysis of the Seventh Amended Complaint by this Court would go beyond enforcing the Order," because the Court "necessarily would be expanding on the Order while it is on appeal in contravention of the divestiture rule. (Civ. No. 23-447, D.I. 1-1 at 4).  As the Bankruptcy Court explained:

> Here, the Court is neither altering nor enlarging its appealed order –
> the Court is enforcing it. The crux of the Court's Opinion – that the
> sixth amended complaint contained certain claims that were
> prohibited by the plan injunction – is not subject to reconsideration
> in this Court. Rather, the Court is determining whether the changes
> made in the seventh amended complaint cure those defects. If so, the
> revised complaint may proceed in state court; if not, it is barred by
> this Court's injunction. Neither of those two outcomes alters in any
> way the Court's reasoning as set out in the Memorandum Opinion.

(*Id.* at 5).  Plaintiffs followed the letter of the Bankruptcy Court's prior instructions, as set forth in the Opinion, by submitting the Seventh Amended Petition.  I am not persuaded by the Supporting Sponsors' argument that any substantive analysis of the Seventh Amended Petition would go beyond enforcing the Bankruptcy Court's prior Order.

---

[6] As a practical matter, the sequence of rulings and appeals has had no negative impact on the appeal process.  The Bankruptcy Court entered what I think was an interlocutory order on February 22, 2023, and both sides appealed; the Bankruptcy Court entered what I think is a final order on April 18, 2023, and both sides appealed a second time.  Months later, on July 21, 2023, Plaintiffs filed their opening brief, which was the first brief filed.  There has been no interference with the appeal process.

The Supporting Sponsors next argue that the letter ruling "necessarily expanded" upon the prior Order and cite two examples in support. (D.I. 24 at 46-49).  In a thorough ruling, the Bankruptcy Court considered both examples and held that the Seventh Amended Petition complied with the Prior Order and did not violate the plan injunction.  The Supporting Sponsors cite the same portions of the Seventh Amended Petition in their challenge to the letter ruling but fail to demonstrate any error in the Bankruptcy Court's reasoning.

First, the April 18 letter ruling determined that, as amended, Count VII of the Seventh Amended Petition sought to hold the Supporting Sponsors liable for their own conduct and was thus not released by the Plan.  (D.I. 1-1 at 8).  According to the Supporting Sponsors, that determination directly contradicted—and substantially altered—the Bankruptcy Court's prior Order which held that the nearly identical "Count VIII" of the Sixth Amended Petition had been released as property of the estate.  The Bankruptcy Court "at least expanded upon" its prior Order, the Supporting Sponsors assert, "by accepting allegations in the Seventh Amended Petition that bore a close resemblance to allegations the bankruptcy court held were released with respect to the Sixth Amended Petition."  (D.I. 24 at 49).

The Bankruptcy Court rejected this argument, holding that it was simply applying its prior Order to the Seventh Amended Petition.  The Bankruptcy Court observed that, "despite being labeled 'Direct Liability of the Owners and Sawgrass Holdings GP LLC,' [the count] is in substance a claim for veil piercing." *In re TPC Grp.*, 2023 WL 2168045, at *3.  As such, the Bankruptcy Court held that Count VIII "is simply a claim for ordinary veil-piercing" and "must be removed." *Id*. at *2.  The Bankruptcy Court further held, "Other claims that depend on the allegations of direct action or inaction by the Owners, and do not rely on claims of veil piercing or alter ego, are not barred by the plan injunction." *Id*. at *10.

The Seventh Amended Complaint does not remove Count VIII, but sought to amend the

substantive allegations to comport with the Bankruptcy Court's ruling. I agree that Count VII of

the Seventh Amended Petition, which replaced Count VIII of the Sixth Amended Petition,

complies with the Order and the plan injunction. It states:

> 129. Plaintiffs do not bring any traditional veil-piercing causes-of-
> action in this petition, and any party suggesting otherwise does so
> contrary to everything plead in this petition and the averment, here
> once again, that no veil-piercing claims are brought here. Instead,
> Plaintiffs bring causes of action against Owners whom Plaintiffs seek
> to hold "directly and personally liable for their own tortious conduct
> even when committed in the course and scope of their employment or
> in their role as corporate agents."
> ...
> Plaintiffs sue Owners and Sawgrass Holdings GP LLC in their
> personal and individual capacities for negligence, negligent
> undertaking and direct participation in the events designed to create a
> fraudulent depiction of TPC's value so they could benefits by
> increasing a sales price for TPC for their own direct benefit, as well as
> the other violations noted in this petition.
>
> 130. Specifically, Owners, including but not limited to Sawgrass
> Holdings LP and Sawgrass Holdings, GP LLC ("shareholders"),
> maintain such a high degree of operational control and direction,
> usurped safety functions, financial interest, and ownership, over TPC,
> it is really Sawgrass, which is owned by funds that are sponsored by
> First Reserve and SK Capital, which governs TPC Group, LLC and
> TPC Group, Inc and operated TPC's Port Neches plant by their direct
> conduct and for their personal benefit.
> ...
> Further, shareholders' financial interest is exceeded only by the
> degree of control shareholders exercise over TPC. Peggy Macatangay
> informs Plaintiffs that TPC requests approval from shareholders to
> conduct its affairs – such approval requests include but are not limited
> to any expenditure of more than $1,000,000 and turnaround approval
> and authority in excess of $5,000,000.00.
>
> 131. But for want of approval for a turnaround, a necessity to
> ameliorate the endemic viral infection of popcorn polymerization
> within the TPC Port Neches plant, the explosions and subsequent
> plumes of toxic air which accompanied same, would not have
> occurred and Plaintiffs and others would not have suffered the
> devastation so suffered nor would Plaintiffs and others have suffered
> similar unwelcome injuries and disruption to their daily lifestyles. To

27

> allow the Owners, including but not limited to Sawgrass Holdings LP
> and Sawgrass Holdings GP LLC, to escape liability for their direct
> conduct engaged in for their personal benefit would be to the
> detriment, injury, and damage to Plaintiffs and their community.

(A806-809).  As the Bankruptcy Court explained, Count VII, which has the same title as the prior

Count VIII, in substance now seeks to hold defendants liable "in their personal and individual

capacities for negligence, negligent undertaking and direct participation in the events designed to

create a fraudulent depiction of TPC's value."  (*See* Seventh Amended Petition ¶ 129).  Count VII

describes the extent of defendants' operational control over TPC, including an allegation that

debtors required defendants' approval for certain expenditures.  (*Id.* ¶ 130).  Count VII ends with

the allegation that, but for defendants' refusal to authorize certain safety expenditures, the

explosion would never have occurred.  Accordingly, Plaintiffs seek to hold defendants liable "for

their direct conduct engaged in for their personal benefit . . ."  (*Id.* ¶ 131).

    I agree that Plaintiffs have removed the parts of Count VIII of the Sixth Amended Petition

that the Bankruptcy Court found to be inconsistent with the plan injunction.  (D.I. 1-1 at 8).  As

the letter ruling explained, Plaintiffs struck the portion of Count VIII arguing that "the distinct

corporate identity of the corporation— TPC—will not protect" defendants if "recognizing the

distinct corporate identity will frustrate the ability of injured parties to seek damages"—a hallmark

of alter ego allegations.  (Sixth Amended Petition ¶ 135).  Similarly, Plaintiffs removed language

from Count VIII urging that defendants should not be allowed "to hide their independent torts

behind the corporate form of TPC," or "rely upon the [separate] existence of [distinct legal

entities] . . . to escape the imposition of . . . obligations . . . for which they should be held liable."

(*Id.* ¶¶ 136-137).  "With these sections removed," the Bankruptcy Court explained, "all that

remains are allegations that defendants, through their control of the debtors, voluntarily assumed a

duty safely to manage debtors' affairs, and breached that duty by failing to approve certain safety

precautions." (D.I. 1-1 at 8). "Such claims, although reliant on facts that might also support a claim for veil piercing (but for the fact that such a claim is enjoined), are not barred by the plan's injunction." (*Id.*)

Supporting Sponsors fail to address the Bankruptcy Court's well-reasoned analysis, and I find no error. Thus, inasmuch as the Letter Ruling accepted the amended count as compliant with its prior Order and the plan injunction, the Bankruptcy Court did not expand on its prior Order.

Second, the Supporting Sponsors argued that the Seventh Amended Petition failed to comply with the Bankruptcy Court's prior Order because it failed to remove the "various assertions about veil piercing and hiding behind the corporate shield." (*See* D.I. 1-1 at 8). "Because Plaintiffs' petition contained a 'hodgepodge of allegations,'" Supporting Sponsors assert, "there was a significant question as to precisely which allegations could remain in Plaintiffs' state-court pleadings *without* improperly asserting a veil-piercing theory of liability." (D.I. 24 at 46-47). "As such, categorization of Plaintiffs' factual allegations" was at issue on appeal and should not have been a subject of the letter ruling. (*Id.* at 47). The Bankruptcy Court rejected Plaintiffs' arguments that "many of [plaintiffs'] claims against the Supporting Sponsors remain disguised veil-piercing claims" and are therefore barred by the debtors' plan, explaining that it had already ruled on this issue. (*See* D.I. 1-1 at 9 (quoting Supporting Sponsors' letter opposition)). For example, the Supporting Sponsors argued that a claim for negligent undertaking was really a veil-piercing claim in disguise because both causes of actions relied on allegations that the Supporting Sponsors effectively directed the debtors' operations:

> The gravamen of the claim for negligent undertaking is that the Supporting Sponsors played such an active role in directing the day-today affairs of the debtor that they themselves were effectively making the decisions regarding the company's safety function. Those same factual allegations – that the Supporting Sponsors effectively directed the debtor's day-to-day operations – are also the basis of their veil-piercing claim (which, as described above, is actually an estate

29

> cause of action). The factual overlap, however, does not convert the
> claim for negligent undertaking into a claim for veil piercing.

*In re TPC Grp.*, 2023 WL 2168045, at *8. I agree that the Bankruptcy Court has already properly

rejected this argument. Under Supporting Sponsors' view, any allegation that the Debtors acted

under the direction of the Supporting Sponsors would be disallowed. Such allegations, however,

are central to the tort of negligent undertaking, even if they may also be used to support a claim for

veil piercing. The Supporting Sponsors do little to challenge the Bankruptcy Court's reasoning on

appeal. Inasmuch as the letter ruling permitted the Seventh Amended Petition to contain

allegations that the Debtors acted under the direction of the Supporting Sponsors, the letter ruling

did not expand or modify its prior Order.

Having determined that the letter ruling merely enforced the Bankruptcy Court's Order,

and did not expand upon or modify that Order, the Supporting Sponsors' divestiture argument

fails.

## V.     CONCLUSION

For the foregoing reasons, I will affirm the Order. A separate order will be entered.